LUTHERAN GENERAL HEALTH CARE SYSTEM *et al.*, Plaintiffs-Appellees, v. THE DEPARTMENT OF REVENUE, Defendant-Appellant.

First District (2nd Division)   No. 1—90—3475

Opinion filed June 16, 1992.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Claudia E. Sainsot, Assistant Attorney General, of Chicago, of counsel), for appellant.

Mayer, Brown & Platt, of Chicago (Thomas J. McCarthy, Lynne M. Raimondo, and Ira J. Belcove, of counsel), for appellees.

JUSTICE McCORMICK delivered the opinion of the court:

The Department of Revenue (the Department) appeals from an order in administrative review, finding that plaintiffs were entitled to an exemption from real estate taxes. The Department argues that the circuit court erred in reversing the finding of the administrative law judge that plaintiffs did not use the property in question for charitable purposes. The Department also argues that plaintiffs' complaint in administrative review was not filed in a timely manner.

Plaintiffs are the Lutheran General Health Care System (the System) and the Health Care Medical Foundation (the Foundation). The System is a Federal tax-exempt charitable organization and a part of a nationwide network of health and human service organizations operated by its parent corporation, the Evangelical Lutheran Church of America. At the time this case arose, the System operated Lutheran General Hospital in Park Ridge, Illinois, and Lutheran General Hospital-Lincoln Park in Chicago.

The Foundation is a multi-specialty physicians' group formed in affiliation with Lutheran General Hospital. The Foundation, like the System, is a Federal tax-exempt charitable organization.

In August 1987, the System purchased a one-story building located at 6000 West Touhy in Chicago and rented approximately 60% of the building to the Foundation at a fair market rent. The property was used by the Foundation for operation of a multi-specialty, out-patient clinic and to provide medical care and treatment to in-patients of Lutheran General Hospital and Lutheran General Hospital-Lincoln Park.

Subsequently, plaintiffs applied to the Cook County Board of Appeals for an exemption from real estate taxes for that portion of the property leased to the Foundation. Plaintiffs contended that the property was used for educational and charitable purposes and, therefore,

was exempt from taxation under sections 19.1 and 19.7 of the Revenue Act of 1939 (Revenue Act) (Ill. Rev. Stat. 1985, ch. 120, pars. 500.1, 500.7).

The Board of Appeals approved plaintiffs' exemption application, but the Department later reversed that decision. Following the Department's reversal, plaintiffs requested and were granted a formal hearing on their exemption application.

The hearing was held May 9, 1989, before administrative law judge George Nafziger. At the hearing, Leighten Smith, the Foundation's president, testified that in 1980, the Foundation's predecessor, Health Care Associates, was formed in response to a decrease in funding for graduate medical education programs. Smith testified that Health Care Associates was a for-profit group similar to a faculty practice plan. Smith described a faculty practice plan as an organization of physicians involved in the teaching and administrative programs of an institution or major teaching medical center. In the case of Health Care Associates, its affiliation was with the University of Illinois.

According to Smith, the faculty practice plan was utilized as a vehicle to provide funds for the cost of graduate medical education, i.e., fees generated from professional services would be used to pay the faculty and to pay other expenses incurred in conducting the educational programs and in providing ambulatory or out-patient care.

In 1984 Health Care Associates was restructured into a not-for-profit corporation and its name was changed to the Health Care Medical Foundation. Smith testified that the changes were made to enable the Foundation to obtain research grants and to allow it to retain surplus revenues at the end of a fiscal year.

The Foundation is controlled by a 15-member board of directors. Eight of the directors are the clinical division chairmen of Lutheran General Hospital. Smith testified that the presence of these eight directors is designed to further the faculty practice plan and to insure that the Foundation is in step with the programs of the System and the hospitals.

The seven remaining directors are elected by the Foundation's shareholders. A physician who has been employed by the Foundation for three years may become a shareholder by purchasing one share of the Foundation's stock for $20. The stock confers no ownership interest in the Foundation and when a physician's employment ceases the Foundation repurchases the share for $20.

The physicians employed by the Foundation are paid a salary based upon their patient care activities as well as their educational, administrative, and research activities. Approximately 52% of the physicians'

time is spent in educational, research, and administrative activities and, according to Smith's testimony, a physician with no desire to teach would not be hired by the Foundation. Smith also testified that the physicians are not allowed to maintain private practices and that the salary paid to them by the Foundation is less than that which they would receive in a private practice.

Describing the property on West Touhy, Smith testified that the original intention was to develop the property as an arthritis treatment center; however, the building eventually was used to house expanded programs in geriatric medicine, rheumatology and primary care. Smith further testified that the property was used primarily to treat elderly patients. According to Smith, the property provided the patient volume necessary to maintain the System's graduate fellowship program in geriatrics and was vital to the continuing accreditation of the fellowship.

Smith characterizeded the property as a major teaching site, explaining that it was used by all internal medicine residents, who are required to do a rotation in rheumatology; by family practice residents who choose to take a rotation in rheumatology; and by senior medical students, primarily from the University of Illinois, who elect to do a clerkship in rheumatology.

Smith testified that in 1987, there were a number of pharmaceutical clinical trials underway at the property and studies on the detection of abdominal aneurysms in the elderly and bone density in senior citizens were also being conducted. Smith stated that because these studies could not be conducted in a hospital on an in-patient basis, the patient base at the West Touhy site was essential to this research.

Smith stated that the Foundation's charges to its patients at the West Touhy site are competitive with the charges of other medical service delivery systems, but that the physicians employed by the Foundation have no interest in the revenues generated by the charges other than the salaries they received from the Foundation. However, a physician could make a judgment to write off or not charge an account based on a patient's financial situation. Smith further testified that no patients are turned away or refused treatment because of the inability to pay.

Kenneth Rojek, vice-president for practice management at Parkside Human Services Corporation (Parkside), also testified for plaintiffs. Parkside, a tax-exempt subsidiary of the System, provides professional management services to the Foundation. Rojek testified that the Touhy property was purchased because the Foundation did not have enough space on campus to conduct research or to continue to expand and develop programs in geriatric medicine and in arthritis and primary care

services. Rojek testified that this lack of space had threatened the accreditation of the hospitals' teaching programs.

Rojek also testified that Parkside did the billing for doctors employed by the Foundation, but that a doctor could waive a fee if it was determined that a patient was unable to pay. Rojek stated that no one would be denied care based on an inability to pay and that patients with previously unpaid bills would be accepted for treatment. Rojek further stated that while attempts are made to collect unpaid fees, the Foundation has a policy of not suing to collect fees, except in very unusual circumstances.

On January 11, 1990, Nafziger issued a recommendation that the Touhy property remain on the tax rolls. In reaching his recommendation, Nafziger relied on the six guidelines for determining whether property is being used for charitable purposes that were set forth by the Illinois Supreme Court in *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N.E.2d 537.

In *Korzen*, the supreme court held that a use is considered charitable when (1) it is for the benefit of an indefinite number of persons, persuading them to an educational or religious conviction, for their general welfare or in some way reducing the burdens on government; (2) the charitable institution has no capital, capital stock, or shareholders, and earns no profits or dividends; (3) the institution derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in its charter; (4) charity is dispensed to all who need and apply for it and gain or profit is not provided in a private sense to any person connected with the charitable institution; (5) it does not appear that any obstacles are placed in the way of those who need and would avail themselves of the charitable benefits dispensed; and (6) the primary purpose for which the property is used is charitable. *Korzen*, 39 Ill. 2d at 157.

Nafziger found that the Foundation met two of these guidelines: the requirement that charity be dispensed to all who need and apply for it and the requirement that no obstacles be placed in the way of those seeking the benefits. However, Nafziger also found that the property was not being put to a charitable use because the Foundation had capital, capital stock, and shareholders who profited from the enterprise and because the Foundations funds were not derived mainly from private and public charity. In addition, Nafziger based his denial of a charitable exemption on his determination that, while there was an indirect benefit to the public, the primary beneficiaries were the Foundation's physician stockholders.

A copy of Nafziger's recommendation was mailed to plaintiffs on January 12, 1990. On January 18, 1990, plaintiffs' counsel wrote to Nafziger informing him that page 7 had been omitted from plaintiffs' copy of the decision. The letter further stated that it was plaintiffs' understanding that a complete copy of the decision would be sent to plaintiffs and that the mailing of disposition records would be corrected so that the 35-day filing period for administrative review would not commence until the complete copy was mailed.

A complete copy of the recommendation was delivered to plaintiffs on January 22, 1990. The certificate of mailing accompanying the complete copy stated that the decision was mailed on January 18, 1990.

On January 29, plaintiffs' counsel wrote to Nafziger a second time, pointing out that Nafziger's recommendation failed to address plaintiffs' contentions that the property was eligible for an educational exemption under section 19.1 of the Revenue Act and requesting reconsideration of the denial of exempt status. In a letter dated February 5, 1990, Nafziger stated that the Revenue Act did not provide for rehearings or reconsideration. However, Nafziger added that in his original recommendation he determined that the Foundation was a for-profit corporation and that, based on the supreme court's decision in *Montgomery v. Wyman* (1889), 130 Ill. 17, 22 N.E. 845, such corporations did not qualify for exemptions for school purposes.

On February 21, 1990, plaintiffs filed a complaint in administrative review in the circuit court. The complaint alleged that Nafziger erred in finding that plaintiffs failed to meet four of the six standards set forth in *Korzen*. The complaint also alleged that Nafziger's decision failed to address plaintiffs' claim that the property was exempt under section 19.1 of the Revenue Act and that Nafziger's reliance on *Montgomery v. Wyman* was erroneous as a matter of law.

On November 5, 1990, the circuit court issued a memorandum decision reversing the Department's denial of a property tax exemption. The court held that Nafziger's finding that plaintiffs failed to meet all the guidelines set forth in *Korzen* was against the manifest weight of the evidence. Applying those guidelines, the court found that the Foundation's activities benefitted an infinite number of persons and that the corporate form utilized by the Foundation did not fit into the "corporate profit-motivated framework" contemplated by *Korzen*. The court also found that the record established that the Foundation was funded by grants as well as patient fees and that the property was used primarily for charitable purposes.

I

■ The Department argues that the circuit court lacked jurisdiction to hear plaintiffs' complaint in administrative review under section 3—103 of the Code of Civil Procedure. (Ill. Rev. Stat. 1987, ch. 110, par. 3—103.) Section 3—103 provides that "[e]very action to review a final administrative decision shall be commenced by the filing of a complaint *** within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected thereby." A decision is considered served when it is deposited in the United States mail. *Cox v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 399, 451 N.E.2d 842; *Schlobohm v. Police Board* (1984), 122 Ill. App. 3d 541, 461 N.E.2d 601.

The Department argues that the decision in the present case was served when it was mailed to plaintiffs on January 12, 1990, and, therefore, the complaint filed on February 21, 1990, was untimely. Plaintiffs contend that because the copy of the decision mailed to them was incomplete, the 35-day period did not began to run until January 18, 1990, when a complete copy of the decision was mailed.

In *Johnson v. State Employees Retirement System* (1987), 155 Ill. App. 3d 616, 508 N.E.2d 351, this court stated that the 35-day period for administrative review does not begin to run until the administrative agency has provided the plaintiff with adequate notice of its decision. This is because the right to review includes not only the right to present evidence but also a reasonable opportunity to know what claims must be defended against and what consequences are proposed. (*Department of Revenue v. Jamb Discount* (1973), 13 Ill. App. 3d 430, 301 N.E.2d 23.) To be effectual the notice should be so full and clear as to disclose to persons of ordinary intelligence what is proposed; and in making the determination of whether there has been adequate notice, the test is whether the recipient should have anticipated the effects and orders possible. *Johnson*, 155 Ill. App. 3d at 619; *Jamb Discount*, 13 Ill. App. 3d at 435.

■ In the present case, the Department argues that the portion of the decision mailed to plaintiff on January 12, 1990, was sufficient to advise plaintiffs of Nafziger's findings of fact and conclusions of law. The Department argues that, therefore, the 35-day period began to run at the time of the first mailing.

We find that while the portion of the first decision mailed to plaintiffs was sufficient to inform them that Nafziger had denied their request for an exemption, it was insufficient to inform them of what claims should be addressed in their complaint for administrative review.

The failure to include a full page of the 7½-page decision was not a minor omission. Until a complete copy of the decision was received, plaintiffs had no way of knowing that Nafziger failed to address the school exemption issue; nor could they know the precise grounds on which Nafziger relied in denying them tax-exempt status. While plaintiffs could have filed a complaint for administrative review without this information, we believe it would be unfair to require them to file a complaint where they can only guess at the contents of the decision they are seeking to have reviewed.

Accordingly, we hold that the phrase "copy of the decision" as used in section 3—103 should be read as requiring that plaintiffs be served with a complete copy and not just a portion of the decision.

## II

The Department next argues that the trial court erred in reversing the finding that plaintiffs' property was not used for charitable purposes. The Department argues that because the administrative agency was both the finder of fact and the interpreter of the law, its findings and conclusions of fact should be held *prima facie* true and correct.

■ However, as plaintiffs point out, the evidence in the present case was uncontradicted. Where the relevant facts are undisputed, the decision as to whether the property is exempt is a question of law, depending solely upon an application of the appropriate legal standard to the undisputed facts. (*Lutheran Child & Family Services v. Department of Revenue* (1987), 160 Ill. App. 3d 420, 513 N.E.2d 587; *Highland Park Hospital v. Department of Revenue* (1987), 155 Ill. App. 3d 272, 507 N.E.2d 1331.) In such a case, the appellate court's role is to determine whether the trial court properly found that the property in question was entitled to tax-exempt status. *Lutheran Child & Family Services*, 160 Ill. App. 3d at 423.

■ Here, plaintiffs sought exemptions under sections 19.7 and 19.1 of the Revenue Act. Section 19.7 provides for an exemption from taxation for:

> "All property of institutions of public charity, all property of beneficent and charitable organizations, \* \* \* and all property of not-for-profit organizations providing services or facilities related to the goals of educational, social and physical development, \* \* \* when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit \* \* \*." Ill. Rev. Stat. 1987, ch. 120, par. 500.7.

As stated above, the supreme court has set forth six guidelines to be used in determining whether property is exempt under section 19.7. (*Korzen*, 39 Ill. 2d 149, 233 N.E.2d 537.) Of these six, Nafziger found that plaintiffs failed to meet numbers (1), (2), (3), and (6).

GUIDELINE (1)

In finding that plaintiffs did not meet guideline (1), Nafziger relied on *Mason District Hospital v. Tuttle* (1978), 61 Ill. App. 3d 1034, 378 N.E.2d 753.

In that case, the Mason District Hospital built a medical office center in order to attract doctors to the area. The center was used by the doctors in carrying on their private practices and each was charged a rent based upon the square footage of the area they used. The hospital received no revenues from the doctors' private practices. The doctors operated their practices on a profit basis, they were not required to provide any medical services to the hospital, and they did not provide care for those who could not pay.

The appellate court rejected the hospital's claim for an exemption, holding that the primary use of the facility was as an office center for the physicians privately practicing there and that any charitable purpose was incidental. In the present case Nafziger reached the same conclusion with respect to the doctors employed by the Foundation. However, it seems clear that the Foundation's use of its property differs substantially from that of the Mason District Hospital.

Smith's testimony in the present case established that the doctors employed by the Foundation were not allowed to maintain private practices, the salaries received by the physicians were below that which they might receive in a private practice, the physicians had no interest in the patients' fees which were paid directly to the Foundation, and no patients were turned away because of an inability to pay. In addition, the physicians were required to perform educational, administrative, and research activities in order to continue their employment with the Foundation.

In *Sisters of the Third Order of St. Francis v. Board of Review* (1907), 231 Ill. 317, 83 N.E. 272, it was argued that the hospital in question was not a charity because it was being conducted for the benefit of a limited class of physicians permitted to practice at the hospital. The supreme court disagreed, stating that the question of whether the hospital was an institution of public charity did not depend on the class of physicians permitted to practice there so long as the institution was not conducted for the purpose of benefitting the physicians of that class. *Sisters of St. Francis*, 231 Ill. at 323.

■ Here, because the physicians receive a below market income and are not allowed to develop and maintain private practices, it cannot be said that the property is used primarily for their benefit. And, in light of the testimony that treatment is provided regardless of ability to pay and that the property is used to conduct research on medical treatment for senior citizens, we find that the trial court properly concluded that the major benefit is received by the patients who are treated and those who gain from the research conducted.

In arguing that Nafziger's finding should be upheld, the Department places reliance on *Highland Park Hospital* (155 Ill. App. 3d 272, 507 N.E.2d 1331). There, the hospital sought an exemption for a portion of a building used as an immediate care center, arguing that the decision in the *Sisters of St. Francis* was controlling because the center dispensed charity to all who applied for it and no obstacles were placed in the way of those seeking treatment.

The appellate court denied the exemption, noting that even though 6% of the patients never paid for the care received, all patients were billed for their treatment and there was no evidence that the general public knew that free care was available at the center. The court described the 6% of the uncollected bills as nothing more than bad debts. *Highland Park Hospital*, 155 Ill. App. 3d 272, 507 N.E.2d 1331.

Here, however, Nafziger found that charity is dispensed to all who need and apply for it and that no obstacles are placed in the way of those seeking benefits. The Department has not appealed this finding and, therefore, the decision in *Highland Park Hospital* is inapplicable.

GUIDELINE (2)

Nafziger found that plaintiffs did not meet this guideline because the Foundation had capital, capital stock, and shareholders. However, Smith's testimony established that the stock conferred no ownership interest in the corporation, no dividends were paid on the stock, and it did not appreciate in value. The sole benefit conferred by the stock to the physician shareholder is the right to vote on administrative issues. Thus, to deny a charitable exemption on this basis could only be described as a triumph of form over substance.

Nafziger also found that because the Foundation bylaws provided that the members of the board of directors could be compensated for serving on the board, there was a possibility that the physicians could earn a profit. The Department argues that Nafziger's decision was correct and that the physicians' ability to profit from the enterprise is similar to the situation in *People ex rel. County Collector v. Hopedale Medical Foundation* (1970), 46 Ill. 2d 450, 264 N.E.2d 4.

In *Hopedale Medical Foundation*, the foundation's medical director held a mortgage on all of the property and buildings in the complex; operated a private medical practice out of his office in the hospital; received a substantial salary for the performance of managerial services; and was paid fees for specialized medical functions such as administering anesthetics, performing pre- and post-operative services, and giving physical exams to employees. In addition, the medical director derived financial benefits from fees for consulting services carried on with the aid of foundation personnel and from operation of a private pharmacy that sold to the hospital on a "cost plus" basis. In denying a charitable exemption, the supreme court held that the foundation was operated for the professional and financial benefit of the director and his associates. *Hopedale Medical Foundation*, 46 Ill. 2d at 463.

■ Nothing in the facts of the present case suggests that the plaintiffs' activities bear even a remote resemblance to those in *Hopedale Medical Foundation*. Here the Department has not argued anything beyond a possibility that the Foundation's directors could be compensated. The Department argues that this is all that need be alleged because the only question is whether the corporate structure lends itself to profit taking. The Department provides no support for this argument, and we find that the fact that there might be some possibility that the directors may be compensated at some time in the future is too remote to support the conclusion that the physicians profit from the Foundation's activities.

GUIDELINE (3)

Nafziger found that the Foundation was not entitled to a charitable exemption because its funds were derived primarily from fees for services, not charitable contributions or grants. However, in *American College of Surgeons v. Korzen* (1967), 36 Ill. 2d 340, 348, 224 N.E.2d 7, *overruled on other grounds* in *Christian Action Ministry v. Department of Local Government Affairs* (1978), 74 Ill. 2d 51, 383 N.E.2d 958, where it was argued that the college was not a charitable institution because more than half of its funds came from membership dues, the supreme court stated:

> "A careful reading of the cases indicates that while the source of funds is listed as a characteristic of a charitable organization, each concerns itself primarily with discovery of the facts relative to the use to which the funds are put. *** In final analysis, the cases may be read to mean that where funds are principally derived from dues of members such funds are *per se* held primarily for the benefit of the members rather than in trust for the benefit

of the public. We think, however, a better view is that where it is established that the funds and property are devoted to public purposes, the source of the funds is not the sole determinant factor."

The court has also held that the fact that an institution charges fees for its services from those who are able to pay does not preclude exemption where no profit is made and the amounts received are applied in furthering the institution's charitable purpose. *People ex rel. Cannon v. Southern Illinois Hospital Corp.* (1949), 404 Ill. 66, 69, 88 N.E.2d 20.

■ Here, the fees collected were used to pay the physicians' salaries, to lease the Touhy property, to purchase physicians' services, to fund research, and for other operating expenses. Rojek testified that the Foundation operated at a deficit and that if the Foundations' operation ever did generate a surplus, the money would be used to supplement its research and educational activities. Accordingly, we find that because the fees generated are used to further the Foundation's operations, the fact that its primary source of funding is not public or private charity does not require a conclusion that the Foundation is not a charitable enterprise.

GUIDELINE (4)

■ The Department argues that the Foundation does not meet this guideline because the public benefits only incidentally from the use of the property. However, as we noted above, the Department has not disputed Nafziger's conclusion that the Foundation dispensed charity to all who needed and applied for it and that no obstacles are placed in the way of those seeking benefits. Further, Smith testified that in addition to performing medical services, physicians devoted 52% of their time to performing educational, administrative, and research activities. Additionally, as we stated in our earlier discussion of the supreme court's decision in *Sisters of St. Francis*, there is no basis for a claim that the physicians employed by the Foundation and not the public are the primary beneficiaries of the use of the property.

In conclusion, we find that plaintiffs are entitled to a charitable deduction under section 19.7 and that the circuit court properly reversed the decision denying plaintiffs' claim for exemption.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.